IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 97-cv-00212-MSK-CBS

EDWARD H. PHILLIPS,

      Plaintiff,

v.

AWH CORPORATION, a Delaware corporation,
HOPEMAN BROTHERS, INC., a Delaware corporation, and
LOFTON CORPORATION, a Delaware corporation,

      Defendants.

---

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION
## FOR JUDGMENT AS A MATTER OF LAW

---

**THIS MATTER** comes before the Court pursuant to the Defendants' oral motion for

judgment as a matter of law pursuant to Fed. R. Civ. P. 50, (Tr. 1014-1028)[1], made during trial at

the close of the Plaintiff's case, and the Plaintiff's oral response, (Tr. 1028-34).[2]  Numerous

---

[1]Citations to "(Tr. __)" indicate the relevant page(s) in the trial transcript.

[2]Although the Court reserved ruling on the Defendant's oral Rule 50 motion, Tr. 1034, 1340 (Court advising Defendant that its oral motion was "still outstanding" and did not need to be renewed), the Defendants nevertheless filed a post-trial, written "Renewed Motion for Judgment as a Matter of Law" (# 304), which raised several additional arguments beyond those made in the Defendants' oral presentation.  Because the Defendants neither sought nor obtained leave to supplement the oral motion made at the close of the Plaintiff's case, the Court considers the written motion to be a subsequent Rule 50 motion made at the close of all the evidence, not a supplementation of the oral motion at the close of the Plaintiff's case.  For purposes of deciding the outstanding oral motion, the Court considers the parties' written briefs only insofar as they identify specific portions of the record where evidence relevant to their oral presentations may be found.

1

additional motions remain pending, including the Defendants' Motion for Judgment as a Matter of Law (# 304); the Defendants' Motion for New Trial (# 306); the Plaintiff's Motion to Strike (# 309) the aforementioned motions by the Defendants; and the Plaintiff's Motion to Expedite (#310) resolution of his Motion to Strike. The Court also conducted a post-trial evidentiary hearing on several equitable defenses asserted by the Defendants and the Plaintiff's request for enhanced damages, and reserved ruling on those issues.

<u>FACTS</u>

### A. Background

The Plaintiff is the holder of United States Patent No. 4,677,798 ("the '798 patent" or "the Plaintiff's patent"), relating to the design, manufacture, and testing of modular steel shells for use in the construction of prison/jail facilities. In 1989, the parties entered into an agreement to deploy the Plaintiff's technology in jails to be constructed by the Defendants, but the agreement lapsed in 1990 before any construction occurred.

Beginning in 1991, the Defendants contracted to build seven jails. The seven jails at issue in this case are grouped into two categories. The "first three jails" refer to jails constructed by the Defendants in Hart, Elbert, and Eastman Counties in Georgia. The "last four jails" refer to contracts secured by the Defendants to supply fully-equipped modular steel cells for jails under construction in Lee and Forsyth Counties in North Carolina, a jail in Mahoning County, Ohio, and a jail in Pulaski County, Georgia. The Plaintiff contends that the Defendants' construction in both groups of jails infringes upon several claims in his patent.

A full recitation of the procedural background of this action is unnecessary. It is sufficient to note that the Court construed the contested terms in the patent, and the Plaintiff appealed the

Court's construction ruling (and other rulings) to the Federal Circuit.  In *Phillips v. AWH Corp.*, 363 F.3d 1207, 1216 (Fed. Cir. 2004), a divided panel affirmed the Court's construction ruling in its entirety.  The circuit court agreed to rehear the case *en banc*,  reversed only the claim construction of the term "baffles," and remanded the case for further proceedings,  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1328 (Fed. Cir. 2005) (*en banc*).  Neither the panel nor the *en banc* court reversed the construction of any of the other terms of the patent.

### B. Trial

The case proceeded to a jury trial on a single cause of action of patent infringement. Specifically, the Plaintiff contended that the Defendants infringed on four separate claims in the patent: (i) Claim 21, which describes "a prison detention facility . . . constructed of modular shells . . . with the modular shells enclosing insulating material providing substantial thermal, sound, and impact resistance"; (ii) Claim 22, which describes "modular equipment . . . having steel plate inner and outer wall sections defining end closures . . . with said modules welded together to form the detention structure"; (iii) Claim 24, which describes "Modular equipment as defined in Claim 22, including insulation material"; and (iv) Claim 26, which describes "Modular equipment as defined in Claim 22 including means . . . disposing thermal insulation between the inner and outer walls."

Although the Court has reviewed the entire trial record, for purposes of this motion it is concerned only with the evidence presented by the Plaintiff before he rested.  As to this evidence, a complete summary is unnecessary because the issues to be decided are very narrow.  Thus the Court limits its discussion of the evidence to that which is relevant to the issues raised in the oral Rule 50 motion, and discusses the evidence relevant to each issue in its analysis of that issue.

However, two of the Court's evidentiary rulings warrant mention.  Pursuant to Fed. R.

Evid. 702, the Plaintiff was permitted to offer opinion testimony on matters of building design and

construction.  However, during trial, the Defendants objected to the Plaintiff's failure to disclose

in his expert report that he had visited and inspected the seven jails and had formed his opinions

based, in part, on those inspections.  After conducting a brief evidentiary hearing outside the

presence of the jury, the Court found that the Plaintiff's pretrial disclosure of the basis for his

opinions was insufficient.  It therefore instructed the jury that "you must disregard any of Mr.

Phillips' opinions if it (sic) was based in any way upon his inspection of a prison or any document

obtained from a prison." (Tr. 574).  A similar issue arose with the Plaintiff's other expert witness,

Norman Wirkler.  The Defendants contended that the Plaintiff had failed to disclose that Wirkler

had reviewed a particular document in formulating his opinions regarding the last four jails.  After

extended colloquy, the Court found that Wirkler's pre-trial disclosure was also deficient, and as a

sanction, the Court instructed the jury that "You are to disregard all of his opinions and all of his

testimony with regard to those prisons based on that [document]."[3]   (Tr. 754-55).

### C.  The instant motion

At the close of the Plaintiff's case, the Defendants orally moved for judgment pursuant to

Fed. R. Civ. P. 50.  With regard to the Plaintiff's cause of action for infringement, the Defendants

argued that the Plaintiff had failed to establish infringement upon three limitations in the contested

---

[3]Wirkler had testified that his opinions as to the last four jails was drawn from his review of four documents: the challenged document (trial exhibit 3), and three other documents (trial exhibits 19, 20, and 21) whose disclosure was not challenged.  *See* Tr. 646-55.  Thus, the jury could consider opinions expressed by Wirkler with regard to the last four jails, but only insofar as those opinions were based on the relatively simple exhibits 19, 20, and 21, and not those opinions formed upon review of the more detailed exhibit 3.

claims: the limitations of (i) "end closures" in Claim 22 and dependent Claims 24 and 26; (ii) "insulating material" in Claim 21; and (iii)"welded together" in Claim 21.                With regard to the term "end closures," the Defendants argued that the Court's construction of that term required that the two wall faces were bent to create the end closure, but that according to the Plaintiff's evidence, the Defendants' design required additional pieces of steel joined to the wall faces to create the end closure.  With regard to "insulating material," the Defendants argued that the insulation, by itself, be resistant to bullets and bomb fragments, and that the Plaintiff had failed to establish that the insulation used by the Defendants possessed this property.  With regard to modules being "welded together," the Defendants argued that, although the phrase was not submitted for construction during the claims construction process, its logical reading is that the modules must be welded together, top to bottom, to create unitary walls, and that there was no evidence that their designs utilized floor-to-ceiling welding. The Defendants also argued that they are entitled to judgment on the Plaintiff's claim that their infringement was willful, insofar as the undisputed evidence was that they had sought and obtained advice of counsel that their designs did not infringe the Plaintiff's patent before undertaking any construction.

In response, the Plaintiff argued that the Defendants' argument was based on a misunderstanding of patent law, insofar as the Defendants relied on portions of the patent's specifications to define terms; that the Defendants ignored the doctrine of claim differentiation, particularly with regard to the difference between "impact resistance" in Claim 22 and "bullet resistance" in Claim 23; that the Defendants were attempting to misapply the doctrine of file wrapper estoppel, apparently with regard to the welding issue.  The Plaintiff also pointed to

specific witnesses who testified with regard to the various issues raised by the Defendants (as well as many issues not raised by the Defendants).

Because the trial record was lengthy, entailed numerous sustained objections and complicated instructions to the jury to disregard evidence, and the evidence was often presented in confusing contexts, the Court reserved a ruling on the Defendants' oral motion and allowed the case to proceed.  Having had the luxury of reviewing the trial record in depth, the Court is now prepared to rule on the Defendants' oral motion, and does so without regard to the proceedings that followed that oral motion.

## ANALYSIS

### A.  Standard of review

A motion made under Fed. R. Civ. P. 50 is adjudicated under the same standards applicable to motions for summary judgment under Fed. R. Civ. P. 56.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  The Court must view all of the evidence in the record at the close of the Plaintiff's case, and draw all reasonable inferences in favor of the non-moving party – the Plaintiff.  *Id.*  However, the Court may not make credibility determinations or weigh the evidence, as doing so would intrude upon the jury's role.  *Id.* at 150-51. If the evidence is not sufficient for a reasonable jury to find for the Plaintiff, the Defendants are entitled to judgment as a matter of law.

## B. Infringement

Literal infringement of a patent occurs when each and every limitation contained in a claim is present in the accused product. *Abraxis Bioscience, Inc. v. Mayne Pharma (USA), Inc.*, 467 F.3d 1370, 1378 (Fed. Cir. 2006). Infringement occurs under the doctrine of equivalents if every limitation of the asserted claim, or its "equivalent," is found in the accused product, so long as the "equivalent" differs from the claimed limitation only insubstantially. *Id.* at 1379. The Plaintiff bears the burden of proving infringement by a preponderance of the evidence. *Kegel Co. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1425 (Fed. Cir. 1997).

### 1. End closures

Independent Claim 22, and Claims 24 and 26 which depend upon Claim 22, claims "Modular equipment . . . having steel plate inner and outer wall sections defining end closures..." The parties requested construction of this phrase, and the Court construed that term to mean "modules . . . where the inner and outer walls of the module define the enclosure by being bent to create the end abutment." It does not appear that the Plaintiff sought review of this construction before the Federal Circuit, and in any event, neither the Federal Circuit's panel nor *en banc* opinion purport to reverse this Court's construction of that phrase.

#### (a) The first three jails

The design of the first three jails was shown in Exhibit 22. It is partially reproduced below (the letters and identifying lines have been added by the Court).

7



The end closure of the module is formed by three pieces of metal.  The pieces marked "A" and "C" are continuations of the sheets of metal forming the wall faces, bent into the interior of the module.  However, the two wall faces themselves do not complete the end closure.  The piece marked "B" is a separate piece of metal, and is necessary to completely close off the end of the module.  *See also* (Tr. 693-94).

During the Plaintiff's testimony, he was asked about the piece of metal marked "B" in the diagram above. He stated "I am aware that Hopeman had put this together with some plugs in an attempt not to weld them.  And I had helped them develop the plug, and it held the two faces apart.  It was a plug that held the two of them together, but it also had a spacer for the fire tape to be in the insulation."  (Tr. 288).  The Plaintiff then expressed his opinion under Fed. R. Evid. 702 as to the operation of the piece of metal.  He explained that the function of the piece of metal was "to close the panel off and provide a surface to join the two modular panels together."  (Tr. 289). Asked if the piece of metal "perform[s] the same function as in your patent," whether it "performs it in the same way," and whether "it achieves the same result," the Plaintiff answered affirmatively to each, without any additional explanation.  *Id.*

The only other material testimony regarding the end closures shown in Exhibit 22 was by Wirkler.  He was asked whether Exhibit 22 showed walls that "define end closures," and he

simply responded in the affirmative.  (Tr. 604-05).   This is the entirety of Wirkler's testimony about end closures made in the context of discussing the first three jails.[4]  However, Wirkler provided one additional bit of testimony about end closures that is of interest.  At the close of his cross-examination, he acknowledged certain similarities between the design of Hopeman's end closures and those shown in Figure 3 of a patent issued to an individual named Grafman, decades before the Plaintiff's patent.[5]  (Tr. 741-42).  On re-direct examination, Wirkler was asked to clarify his testimony on this issue, and stated "I did not have the ability to add that there were other pieces in the end panels of the Hopeman device that were different.  There is actually a third or an additional piece of metal added that makes that configuration quite different from this one." (Tr. 757).  Asked how he would characterize the difference between the Hopeman device and the Grafman device on this issue, Wirkler responded that "the Hopeman device [. . .] used folded portions of the wall panel, folded in at some 90-degree turns.  And then in addition to that, there was an additional piece of metal on each end closure added to close the end.  This detail [in the Grafman design] doesn't do that in the same way, in that the end closure isn't – isn't closed until the pieces are brought together."  (Tr. 758).

As noted above, the Court construed the term "end closures" in the Plaintiff's patent to mean "where the inner and outer walls of the module <u>define</u> the enclosure by being <u>bent to create</u> the end abutment." (Emphasis added.)  This limitation requires that the end abutment be created

_____

[4]Wirkler offered some additional substantive testimony about end closures in discussing the last four jails.  For reasons stated with regard to this testimony in the next subsection, it is irrelevant whether that testimony is considered with regard to the last four jails only, or whether it is deemed to apply to all seven jails at issue.

[5]The Grafman patent was received as trial exhibit 15.

entirely by the bending of the wall faces - in short, if the folded sections of wall must "define" the boundaries of the closure, no extra pieces of metal can be used to create the end abutment.

In this respect, it is clear that the end closures used by the Defendants in the first three jails do not literally infringe upon the limitation. As can be seen in the diagram above, the bent portions of the walls of the Defendants' jails do not define or create the entire end abutment. Instead, an independent piece "B" is necessary to close off the modular wall. Put another way, if piece "B" were removed, the module would not be closed off by an end closure or abutment. In the first three jails, the two wall faces do not, by themselves, "define the enclosure"; they only partially define the enclosure's perimeter, and require an additional piece of metal to create the end abutment. Consequently, based upon the evidence presented by the Plaintiff, no reasonable jury could conclude that the Defendant's first three jails literally infringed upon Claim 22, nor upon dependent Claims 24 and 26.

Failing a finding of literal infringement, the Plaintiff argues that, under the doctrine of equivalents, the Defendants' design performs the same function in the same manner and with the same result as the Plaintiff's device. Under the doctrine of equivalents, the Plaintiff may show infringement on a limitation in the claim by showing an "equivalence between the elements of the accused product or process and the claimed elements of the patented invention." *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, ___ F.3d ___, 2006 WL 3346155 *6 (Fed. Cir., Nov. 20, 2006). Such an equivalence occurs when only "insubstantial differences" distinguish the missing element from the corresponding aspects of the accused device. *Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 1423 (Fed. Cir. 1997). Equivalence may be found where the accused device "performs substantially the same function in substantially the same way to obtain

10

the same result" as the patented invention. *Abraxis*, 467 F.3d at 1379. However, equivalence is "not the prisoner of a formula and is not an absolute to be considered in a vacuum." *Id.* at 1380. Importantly, equivalence must be determined under the "all elements" rule, which requires that equivalence be determined on a limitation-by-limitation basis, not as to the claim as a whole. *Depuy*, *supra* at *7. Moreover, the doctrine of equivalents cannot be used to effectively read a limitation completely out of a claim. *Id.*

In light of these principles, the Court finds that, as a matter of law, the Plaintiff failed, both factually and legally, to sufficiently establish an equivalence between the Defendants' end closures in the first three jails and the end closures described in Claim 22. Factually, the evidence of equivalency was deficient. The Plaintiff testified that the function of the end closure in the Defendants' device was "to close the panel off and to provide a surface to join the two modular panels together." (Tr. 289). Assuming that this was a sufficient description of the function served by the end closure in the Defendants' design, there was no testimony as to what function or functions the end closures served in the Plaintiff's design, the manner in which the closures in both designs fulfilled that function, and the results obtained by using each design. Without factual evidence as to the function, manner, and result of the end closure in each design, it would be impossible for a jury to conclude that the designs were equivalent.

For example, the Plaintiff testified that one of the functions of the Defendants' piece "B" was to provide "a surface to join modules together." Perhaps a jury could reasonably infer that the Plaintiff's end closures were intended to serve a similar function, and could even infer the manner by which the Plaintiff's end closures accomplished that function by reviewing the patent. However, there was no testimony whatsoever as to the manner by which the piece "B" design

performed that function. The only testimony that even arguably sought to explain how the end closure permitted modules to be joined together was the Plaintiff's confusing reference to the Defendants' "plug" that "held the two faces apart" (or, alternatively, "held the two of them together"). This testimony fails to offer any clarification as to where and how piece "B" is used to join its module to the adjacent one. Any attempt by the jury to infer how piece "B" allowed modules to be joined together would be nothing more than sheer speculation, and absent such evidence, a reasonable jury could not possibly have found equivalence in the manner in which each design performs the function of joining modules.

Nor are the Plaintiff's conclusory assertions of equivalence sufficient for application of the doctrine. The Plaintiff repeatedly asserted that Exhibit 22 showed "end closures," or testified that the Defendants' closures performed the "same function" the "same way" and with the "same result" as his own.[6]  However, this testimony was wholly conclusory, lacking any explanation of criteria upon which the Plaintiff formed his opinion. Generally, an expert "may not simply tell the jury what result it should reach without providing any explanation of the criteria on which that opinion is based or any means by which the jury can exercise independent judgment." *U.S. v. Daley*, 403 F.3d 1147, 1171 (10th Cir. 2005); *see also PC Connector Solutions, LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005) (granting summary judgment where

---

[6]Interestingly, Wirkler's testimony suggests precisely the opposite: that the Defendants' design differed significantly from the Plaintiff's. As shown in Figure 3 of the Grafman patent, the Grafman design, like the Plaintiff's, called for the end closure to be created solely by bending the wall faces together. Wirkler distinguished the Grafman design from the Defendants' design, noting that the Defendants' use of a third piece rendered the designs dissimilar. Of course, if the Plaintiff's design and the Grafman design are similar, and the Defendants' design is dissimilar to the Grafman design, the transitive property compels the conclusion that it is also dissimilar to the Plaintiff's design.

plaintiff offered "only conclusory statements regarding equivalence, without any particularized

evidence and linking argument").  Indeed, the Plaintiff's conclusory testimony on equivalence is

essentially identical to testimony that was found by the Federal Circuit to "fall[ ] far short of the

long-standing evidentiary requirements for proof of infringement under the doctrine of

equivalents."  *Compare* Tr. 289 *with Hewlett-Packard Co. v. Mustek Systems, Inc.*, 340 F.3 1314,

1322-23 (Fed. Cir. 2003).  To be adequate, the Plaintiff's conclusory opinions of equivalence

would have had to have been supported by "particularized evidence and linking argument,"

showing how the Plaintiff compares the function, means, and result of his end closure design with

the Defendants' design.  *Lear Siegler, Inc. v. Sealy Mattress Co.*, 873 F.2d 1422, 1425-26 (Fed.

Cir. 1989); *Hewlett-Packard*, 340 F.3d at 1323 (evidence of equivalence must be on a limitation-

by-limitation basis).  No such testimony was presented.  Accordingly, the Plaintiff's conclusory

assertions of equivalence are insufficient to allow a reasonable jury to conclude that there was

infringement.[7]

Taken as a whole, the Court finds that entirety of the evidence in the record at the close of

the Plaintiff's case, even when construed most favorably to the Plaintiff, is inadequate for a

reasonable jury to find either literal infringement or infringement by equivalence between the

Plaintiff's end closures and those used by the Defendants in the first three jails.[8]  Accordingly,

---

[7]Similarly, Wirkler's conclusory testimony that an exhibit shows "end closures," without
further explanation or elaboration, is insufficient to carry the Plaintiff's burden of proof.

[8]Moreover, at the level of generality at which it was presented, the Plaintiff's argument of
equivalence would appear to suggest that <u>any</u> device that effectively served the function of
"clos[ing] the panel off and [providing] a surface to join the two modular panels together" would
be the equivalent of his end closure.  By definition, any end closure would necessarily have to
close off the panel, and any conceivable closure adjacent to another module would necessarily
provide a surface by which the adjacent panels could be joined.  Such a broad definition of the

13

Defendants are entitled to a judgment of non-infringement on Claims 22, 24, and 26 with regard to the first three jails.

### (b).  The last four jails

As a result of the sanctions imposed by the Court during trial, the evidence with regard to the last four jails is somewhat less complete.  The Plaintiff testified about having examined Exhibit 3, an overhead view of the design of a pair of adjacent cells in one of the last four jails.  (Tr. 309). He also testified that, during his visit to the Forsyth project, he observed the end closures.  (Tr. 319).  As percipient testimony, he described the closures he saw as "plates that were when you look inside the chase [. . .] it's a flat plate that closes the hole and provides the end surface." *Id.* The Plaintiff illustrated this testimony by drawing on the video screen, (Tr.320), but the record does not contain the markings made by the Plaintiff.  The Plaintiff was then asked how those end closures function compared to his patent.  Again, the Plaintiff offered only a conclusory statement that "they function in all the same was as the modules in my patent." (Tr. 321).  He further opined that "wall panels that are welded [. . .] perform[ ] the same function as those that are bent." (Tr. 322).  The Plaintiff also offered percipient testimony that the end closures at the other jails were "some a little wider, some a little longer, but basically the same thing." (Tr. 328).

---

function to be served by the end closure essentially vitiates the limitation of end closures in Claim 22, as nearly any conceivable method of closing off a module would be deemed an equivalent. *See e.g. Depuy Spine*, *supra.* at *7, *citing Tronzo v. Biomet, Inc.,* 156 F.3d 1154, 1160 (Fed. Cir. 1998).  Thus, even if the jury could simply accept the Plaintiff's conclusory assertion that the Defendant's end closures were equivalent to his, the Court would nevertheless find that, as a matter of law, the Plaintiff's theory of equivalence is so broad as to lack legal sufficiency. *Id.* at *8.

14

Wirkler testified that, with regard to the last four jails, end closures could have[9] been formed by welding a steel piece "at the end of the module." (Tr. 607-08).[10] Asked whether a welded piece of metal would be the equivalent of a folded piece of metal, Wirkler responded "Yes, it can be, if it's welded properly [. . .] it is possible to weld steel with a weld joint that is equal to the original strength of the steel, so you can form a 90-degree angle with steel and have it produce the same strength, the same result, as a bent piece." (Tr. 608). Asked whether "this would perform in the very same manner," and "would accomplish the same purpose" as bending it, Wirkler responded that it would. *Id.* Asked whether he would consider "that to be an insubstantial difference," Wirkler responded that 'Yes, I would. And if the request were made of me on a project, I would allow it, welding vs. bending." *Id.* The Court is aware of no other testimony in the record specifically describing the design of end closures in the last four jails.

As with the first three jails, there is no evidence that the wall faces were bent to define the end closure. Thus, the evidence is insufficient for a jury to find that the Defendants' design directly infringed upon Claim 22.

At the outset, the Plaintiff's presentation regarding equivalence between the end closures in the last four jails and those in his patent suffers from a fundamental evidentiary defect: there is

---

[9]Wirkler acknowledged that he did not inspect any of the prisons, and formed his opinions solely by examining documents. (Tr. 646). Moreover, he testified that, on the document he was asked to examine, the end closures were not shown. (Tr. 607). Thus, his testimony as to how an end closure could have been formed in the Defendants' design is entirely hypothetical.

[10]All of Wirkler's testimony concerning end closures in the last four jails occurred in conjunction with the discussion of trial exhibit 3, *see e.g.* Tr. 605, 607-08, meaning that this testimony was subject to the Court's sanction and the jury would have been required to disregard it. Nevertheless, for the reasons explained herein, even if the jury was permitted to consider the testimony, it would still not be sufficient to allow the case to proceed to the jury.

15

inadequate evidence in the record to explain what the end closures used in the last four jails even were. The Plaintiff's oral testimony merely refers to "a flat plate that closes the hole," without describing how the plate is situated, where and how it is attached, and other details necessary for a full understanding of the Defendants' design. Because the Plaintiff's drawings on the video screen were not preserved, and his testimony is incomprehensible without the aid of those drawings, the Plaintiff's testimony fails to even establish how the last four jails were built, much less provide a basis upon which a reasonable jury could determine equivalency. Wirkler's testimony is of no aid, as Wirkler could only speculate as to how end closures might have been formed in the last four jails. For this reason alone, the Defendants would be entitled to judgment on the end closure issue as it relates to the last four jails.

Putting this defect aside, the Defendants are nevertheless entitled to judgment for reasons similar to those discussed with regard to the first three jails. There is simply insufficient evidence in the record to permit the jury to find that the end closures used on the last four jails were equivalent to the Plaintiff's end closures. Reading the Plaintiff's testimony generously, the only functions he had identified the end closures as performing in the last four jails are closing the module and providing an end surface. As with the first three jails, the skimpy factual record as to how the end closures in the last four jails were designed and how they operated is insufficient to permit a jury to determine that the end closures used by the Defendants are equivalent to the Plaintiff's design. There is no testimony as to the functions performed by the Plaintiff's end closures, the manner in which either design's end closures performed those functions, and the

16

results obtained by each design.[11]  For the same reasons discussed above, the Plaintiff's

conclusory assertions that the two forms of end closures were equivalent is insufficient to fulfill

the Plaintiff's burden of proof.

Wirkler's testimony adds no support to the Plaintiff's claim of infringement by equivalents.

Interestingly, Wirkler's testimony was in sharp contrast to the Plaintiff's, as Wirkler  testified that

a piece of metal welded to the walls to create an end closure would be the equivalent of bending

the wall faces together only "if it's welded properly."  Thus, Wirkler's belief that the Defendants'

design was equivalent to the Plaintiff's was conditional, based on whether the steel plate used for

the end closure was "welded properly."  As mentioned above, no evidence was offered as to <u>how</u>

the steel plate was attached in the construction of the last four jails.  Absent evidence that the

plate was welded, much less that it was "welded properly" in Wirkler's view , there was no factual

predicate upon which Wirkler could express an opinion that the Defendant's end closure was

equivalent to the Plaintiff's.

Thus, the Defendants are entitled to a judgment of non-infringement on Claim 22, and

dependent Claims 24 and 26, with regard to the last four jails as well.

2.  <u>Insulating material</u>

Claim 21 refers to modular shells "enclosing insulating material providing substantial

thermal, sound and impact resistance."  During the claim construction phase of this case, the

Court construed this phrase to mean "materials are required to be disposed within the modular

---

[11]As with the first three jails, any end closure, by definition, would perform the functions
identified by the Plaintiff, and thus, his theory of equivalence is so broad as to effectively nullify
the limitation of end closures.  Thus, his argument of equivalence is insufficient as a matter of law
with regard to the last four jails as well.

shells and the materials provide substantial thermal, sound, and impact resistance." The Court construed the term "impact resistance" to mean "the ability to resist the impact of bullets, exploding projectiles, and bomb fragments."

The Plaintiff raises two arguments in response to the Defendants' contention that this limitation was not shown to be infringed. First, the Plaintiff contends that the Court's construction of the term is (or should have been) that it is the module including the insulation, not the insulation itself, that is required to be impact-resistant. (Tr. 1033).

The Court's construction is clear - it is "the [insulating] materials" that must have impact-resistant properties, rather than the modules as a whole. To the extent that the Plaintiff appears to be seeking reconsideration of the claim construction ruling in accordance with his argument, that request is denied. The Plaintiff appealed from the claim construction ruling, and although it is not clear from the record before this Court whether the Plaintiff raised this issue on appeal, clearly the Federal Circuit's rulings did not overturn this construction. Therefore, having had the opportunity to litigate the construction of the term before this Court and then on appeal, the Plaintiff is either estopped from raising the issue anew, or bound by the determination of the Federal Circuit which, by its silence, could be deemed to be an affirmance of this Court's construction. *See* 363 F.3d at 1216 (panel opinion considered and rejected any other arguments raised by the Plaintiff). In either event, reconsideration of the term's meaning is denied.

Thus, the Court turns to the record to determine whether there is any evidence as to whether the insulation used by the Defendants offered impact resistance. The Plaintiff offered percipient testimony that, during his inspection of the first three jails, he observed that the

modules were insulated with a mixture of rock wool[12] and Vermiculite.  (Tr. 171).  He also stated

that in his inspection of the last four jails, he saw drywall and rock wool, and speculated that there

may also have been Vermiculite present.  (Tr. 324, 330).  When he was asked to explain the

properties of rock wool and Vermiculite, the Plaintiff stated that "They are insulations and they

impede – [. . . t]hey in combination provide fire protection or fire resistancy, sound resistancy; and

by mixing in the Vermiculite, they make it a slightly lighter panel than it would have been had they

not mixed it in," (Tr. 173).  Notably, the Plaintiff did not mention that the insulation provided any

impact resistance.

       The Plaintiff also testified that he tested unspecified <u>modules</u> for impact resistance by

firing a .22 caliber pistol at a completed panel, and that the bullet did not penetrate it.[13]  (Tr. 173-

74).  However, on cross-examination, the Plaintiff was asked  "isn't it true that if you shot a .22 at

that insulation, the bullet would go right through it?," to which the Plaintiff responded "No, sir."

(Tr. 510).  The Plaintiff explained that he believed that the insulation[14] "will certainly impede a .22

bullet, as will drywall."[15]  *Id.*   The Plaintiff offered further conclusory testimony that the

_____

       [12]Jerry Hall testified that the insulation used in one of the first three jails was "mineral
fiber."  (Tr. 458).  Although there was no evidence that rock wool and mineral fiber are the same
thing, the parties appeared to treat them as such, and the Court will do so as well.

       [13]The Court disregards this testimony, as it does not address the impact resistance of the
insulation itself.

       [14]At this point, the Plaintiff referred to the insulation as "steel or copper slag." (Tr. 510).
Taking the evidence in the light most favorable to the Plaintiff, the Court again infers that this is
the same as rock wool or mineral fiber, notwithstanding the Plaintiff's admission that he did not
know what insulation was actually used by the Defendants.  (Tr. 511).

       [15]The Plaintiff refused to speculate as to whether the insulation would also stop a shotgun
shell.  (Tr. 510).

insulation had impact-resistant properties, or that the jails met all of the requirements of Claim 24.[16] *See e.g.* Tr. 297, 302, 325.

Wirkler's testimony regarding impact resistance was a bit more circumscribed.  When asked about impact resistance, he explained that "Impact resistance really isn't any process. You'd need to look at the entire system . . . ." (Tr. 594).  Asked the same question again later, he stated that "you have to look at all of those with the whole system of the wall and the filler."  (Tr. 610).  On his cross-examination, Wirkler was presented with a hypothetical: "If I had an assault weapon and you were standing behind nothing more than a few inches of mineral fiber, and I shot that gun at you, you would feel like you would be protected; is that right?," to which Wirkler responded in the negative.  (Tr. 681).  Wirkler acknowledged that he would expect the bullets to go through the mineral fiber.  *Id.*  He then agreed that "Mineral fiber alone is not going to provide impact-resistance."  *Id.*  Later, Wirkler was asked "Would mineral wool alone be the kind of insulation material that would resist temperature transmission, noise transmission, and bullets or bomb fragments?," to which he responded "Not alone."  (Tr. 684).

Considering the evidence in the light most favorable to the Plaintiff, there is some evidence – namely, the Plaintiff's single statement on cross-examination – that mineral fiber insulation would resist the impact of a .22 caliber bullet.  However, the Court's construction of the term "impact resistance" is broader than that.  The Court construed the term in the conjunctive to mean the ability to withstand the impact of "bullets, exploding projectiles, and bomb fragments." (Emphasis added.)  Nothing in the record addresses the ability of mineral fiber insulation to resist

---

[16]For the reasons discussed above regarding end closures, the Court disregards conclusory statements that do not include the basis for the conclusion.

exploding projectiles or bomb fragments, nor of bullets other than .22 caliber.  Although there is evidence that the insulation would resist one kind of impact, the Court's construction of the term "impact resistance" required the Plaintiff to show that the insulation could withstand a variety of types of impact.  Because the Plaintiff's evidence failed to establish that the Defendants' insulation met all of the limitations in Claim 21, no reasonable jury could find infringement with regard to Claim 21.  Accordingly, the Defendants are entitled to a judgment of non-infringement on this claim.

### 3.  Welded together / willful infringement

Because the foregoing analysis compels entry of judgment in favor of the Defendants on all of the claims asserted by the Plaintiff, it is not necessary to review the remaining arguments raised by the Defendants in their Rule 50 motion.

### C.  Other motions

The Court's disposition of the Rule 50 motion renders the Defendants' written post-verdict Motion for Judgment as a Matter of Law, and all other written motions in this case, moot.

### **CONCLUSION**

For the foregoing reasons, the Defendants' oral motion for judgment as a matter of law, made at the close of the Plaintiff's case, is **GRANTED**.  Judgment shall enter in favor of the Defendants on the sole claim of patent infringement.  The Defendants' Motion for Leave to File an Overlength Brief **(# 302)**; the Defendants' written Renewed Motion for Judgment as a Matter

of Law **(# 304)**; the Defendants' Motion for New Trial **(# 306)**; the Plaintiff's Motion to Strike

**(# 309)** the aforementioned motions by the Defendants; and the Plaintiff's Motion to Expedite

**(#310)** resolution of his Motion to Strike are all **DENIED AS MOOT**.

Dated this 20th day of December, 2006

**BY THE COURT:**

Marcia S. Krieger
United States District Judge